# 15-4077

IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

ESTATE OF ERNEST GOTTDIENER, ESTATE OF JUDIT GOTTDIENER, ERVIN TAUSKY, SUAN INVESTMENTS,
*Plaintiffs - Appellants,*

FREDERICK MARTIN OBERLANDER,
*Movant- Appellant,*

RICHARD E. LERNER,
*Appellant*

J. KRISS, J. KRISS, FOR BAYROCK MERRIMAC LLC, MICHAEL EJEKAM, ALONE, MICHAEL EJEKAM, FOR BAYROCK MERRIMAC LLC, BAYROCK GROUP, LLC, BAYROCK WHITESTONE, LLC, BAYROCK CAMELBACK, LLC,
*Plaintiffs,*

v.

BAYROCK GROUP, LLC, TEVFIK ARIF, JULIUS SCHWARZ, BRIAN HALBERG, SALVATORE LAURIA, ALEX SALOMON, JERRY WEINRICH, NIXON PEABODY, LLP, ROBERTS & HOLLAND, LLP, MARTIN DOMB, CRAIG H. BROWN, BAYROCK WHITESTONE, LLC, DUVAL & STACHENFELD, LLP, BRUCE STACHENFELD, MORGAN LEWIS & BOCKIUS, LLP, DAVID GRANIN, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, ADAM B. GILBERT, BAYROCK SPRING STREET, LLC, BAYROCK MERRIMAC, LLC, SATTERLEE STEPHENS BURKE & BURKE, LLP, BEYS STEIN & MOBARGHA, LLP, ELLIOT PISEM, MICHAEL SAMUELS, MEL DOGAN, JOHN DOES 1-100, BAYROCK CAMELBACK, LLC, BAYROCK GROUP, INC., TAMIR SAPIR, ALEX SAPIR, SAPIR  DOES 1 THROUGH 100, WALTER SAURACK, KELLY ANNE MOORE, NADER MOBARGHA, MICHAEL PETROS BEYS, LENDER INVESTOR JOHN DOES 1-100, FELIX SATER, SALOMON & CO. PC, AKERMAN SENTERFITT, LLP,
*Defendants - Appellees,*

TODD KAMINSKY, CIM GROUP, DONALD TRUMP, IVANKA TRUMP, JOHN DOES 1-100,
*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK NO. 13-CV-3905

## BRIEF OF PLAINTIFF-APPELLANTS
E/O ERNEST GOTTDIENER, E/O JUDIT GOTTDIENER, ERVIN TAUSKY and SUAN INVESTMENTS;
MOVANT-APPELLANT FREDERICK M. OBERLANDER; and
APPELLANT RICHARD LERNER

Frederick M. Oberlander, Esq.
The Law Office of Frederick M. Oberlander, P.C.
Counsel for plaintiffs-appellants
28 Sycamore Lane (Box 1870)
Montauk, New York 11954
(212) 826-0357
fred55@aol.com

Robert S. Wolf
Moses & Singer, LLP
Counsel for defendant-appellee
405 Lexington Avenue
New York, New York 10174
(212) 554-7825
rwolf@mosessinger.com

## CORPORATE DISCLOSURE STATEMENT

Suan Investments is a private entity owned by the Gottdieners, formed under the laws of, and existing in, the Republic of Panama. It has no parent corporation and no publicly held corporation owns any interest in it.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...................................................... I

TABLE OF CONTENTS ............................................................................ II

TABLE OF AUTHORITIES ....................................................................... V

    I.   JURISDICTIONAL STATEMENT ................................................... 1

        A.  The District Court's Jurisdiction ...................................... 1

        B.  This Court's Appellate Jurisdiction ................................. 1

        C.  Timeliness .................................................................... 2

        D.  The Final Judgment Rule .............................................. 2

    II.  OTHER STATEMENTS ............................................................. 3

        A.  Issues Presented, Summary of Facts, Summary of
            Argument, Standard of Review ...................................... 4

           1.  The District Court Failed to Remand ......................... 4

           2.  The District Court Failed to Investigate Witness
              Tampering ............................................................. 5

           3.  The District Court Vacated Plaintiffs' Voluntary
              Dismissal as of Right and "Converted" It to a Dismissal
              With Prejudice, Without Authority, Findings in
              Support, Reason, or Basis ........................................ 6

BACKGROUND ...................................................................................... 8

ARGUMENT ....................................................................................... 10

    III.  THE FAILURE TO REMAND ................................................... 10

        A.  Sater's Removal Asserted "Federal Officer" Jurisdiction ............ 10

B.  Sater's Removal Required That He Plead by Specific Averment That the Acts Charged Were Taken Under Color of Office and That They Were Subject to a Colorable Federal Defense........................................................ 11

C.  Sater's Removal, Like DeVecchio's, Failed to Satisfy *Mesa*......... 12

1.  Sater Failed to Show That He Acted Under Color of Office ................................................................ 12

2.  Sater Failed to Well Aver That He Had a Federal Defense .... 13

IV.  THE FAILURE TO INVESTIGATE SATER'S WITNESS TAMPERING ............ 24

A.  A Hypothetical.................................................... 24

B.  That's not Really Hypothetical. It, and Far Worse, Happened........................................................ 25

C.  The Chronology of the Affront, Which Occurred Shortly After the District Court Denied Remand ...................................... 26

D.  The Court's Refusal to Investigate Allegations of Sater's Witness Tampering and Obstruction, Ruling That the Fifth Amendment Right to a Fair Trial, and the Court's Duty to Ensure One, Somehow Did not Exist at the Pleading Stages ..... 27

E.  Compare This With Judge Posner's Response to Tampering .... 29

V.  THE *ULTRA VIRES* VACATUR OF VOLUNTARY DISMISSAL AND FOLLOWING DISMISSAL WITH PREJUDICE ............................................. 33

A.  The History After the Refusal to Investigate the Tampering...... 33

1.  The following chronology is extracted from the docket:....... 33

B.  The Court's Action Was Without Precedent or Authority......... 37

1.  In Overview ................................................ 37

2. The Court Was Without Authority to Vacate the Dismissal Because the Right to Dismiss Was Plenary and Inviolate ........................................... 38

3. Even If a Special Circumstances Exception Existed at All, Nothing in This Case Justified Its Application ................ 38

4. Even if the Court Could Have Vacated the Dismissal, It Could Not Then Have Ordered a Dismissal With Prejudice ........................................... 40

5. Besides Lacking Standing to Seek Article III Relief, Movants Were Estopped to Seek It ........................................... 40

6. Further Reason Movants Lacked Standing to Seek the Relief ........................................... 41

7. Movant Was Barred by the Doctrine of Unclean Hands ........ 41

CONCLUSION ........................................... 43

CERTIFICATE OF COMPLIANCE ........................................... 44

# TABLE OF AUTHORITIES

## Cases

*Cuomo v. Crane Co.*, 771 F.3d 113, 117 (CA2 2014) ................................ 20

*Gottdiener v. Sater,* 14-1313 .................................................................. 25

*Grass v. Citibank, N.A.,* 90 F.R.D. 79 (S.D.N.Y. 1981) .............................. 39

*Harvey Aluminum v. American Cyanamid Co.,* 203 F.2d 105 (CA2 1953)............ 39

*Hilbert v. McDonnell Douglas Corp.,* 529 F. Supp. 187 (D. Mass. 2008) .............. 21

*In re Neagle,* 135 U.S. 1 (1890) .............................................................. 14

*Kriss et al. v. Bayrock Group LLC et al.,* 10-CV-3959 (SDNY)(Schofield, J.) ......... 8

*Kriss et al. v. Bayrock Group LLC et al.,* Supreme Court, NY Cty. 651715/13........ 8

*Littman v. Bache & Co.,* 252 F.2d 479, 481 (2d Cir.1958) ........................... 39

*Maryland v. Soper,* 270 U.S. 9 (1926)...................................................... 15

*Mesa v. California,* 489 U.S. 121 (1989)................................................... 11

*Nesbiet v. GE,* 399 F. Supp. 2d 205 (SDNY 2005)..................................... 21

*Reiser v. Fitzmaurice,* 1996 WL 54326 (SDNY 1996) ................................ 21

*State of Colorado v. Symes,* 286 U.S. 519 (1932)....................................... 22

*State of North Carolina v. Ivory,* 906 F.2d 999 (CA4 1990) ....................... 22

*State of North Carolina v. Cisneros,* 947 F.2d 1135 (4th Cir. 1991) ............. 22

*Thorp v. Scarne,* 599 F.2d 1169, 1175-76 (2d Cir.1979)............................. 39

*Westmiller v. IMO Indus.,* 2005 U.S. Dist. Lexis 29731, *9 (WD Wash. 2005) .....21

*Willingham v. Morgan,* 395 U.S. 402, 405 (1969)...................................... 10

*New York v. DeVecchio,* 468 F. Supp. 2d 448 (E.D.N.Y 2007).................... 12

*Universidad Central Del Caribe v. Liaison Committee,* 760 F.2d 14 (CA1 1986) 39

## Statutes

28 U.S.C. § 1291 .................................................................................... 1

28 U.S.C. § 1442 .................................................................................... 1

## Rules

FRCP § 41(b) ......................................................................................... 1

FRCP § 41(a) ....................................................................................... 36

FRCP § 59 ............................................................................................ 40

FRCP § 60 ............................................................................................ 38

# F.R.A.P § 28 AND L.R. § 28.1 REQUIREMENTS

## I.   JURISDICTIONAL STATEMENT

### A.   THE DISTRICT COURT'S JURISDICTION

The plaintiff-appellants, with other plaintiffs, commenced this action, known as *Kriss II* to distinguish it from *Kriss I*, an earlier, partially related case, by filing a Summons with Notice in New York State Supreme Court, New York County[1].

Defendant-appellee Felix Sater removed this case to the Southern District of New York pursuant to 28 U.S.C. §1442(a)(1), where it was assigned to the Hon. Lorna G. Schofield, the same judge to whom had been assigned *Kriss I*.

The district court denied plaintiff-appellants ensuing motion to remand[2], thus finding jurisdiction.

### B.   THIS COURT'S APPELLATE JURISDICTION

Plaintiff-appellants appeal from a final judgment, *viz.* an order of the district court dismissing this case with prejudice pursuant to F.R.C.P. § 41(b).

Jurisdiction thus lies pursuant to 28 U.S.C. § 1291, which provides appeal to this court as of right from final judgments below.

---

[1] *Kriss et al. v. Bayrock Group LLC et al.,* Supreme Court, New York County, No. 651715/13.

[2] This was a superseding version of the motion to remand, which supplanted an earlier iteration.

1

C.    Timeliness

On November 6, 2015 the order dismissing this case was entered.

On December 16, 2015, notice of appeal was filed.

On March 29, 2015, plaintiff-appellants' opening brief was due to be filed.

On March 28, 2015, counsel moved for a brief enlargement of time to file.

On April 6, 2016, the court dismissed the appeal for failure to file a brief, then denied the motion for enlargement as moot.

On April 20, 2016 the court issued a mandate releasing jurisdiction.

On April 20, 2016, counsel timely moved for recall of the mandate and for reinstatement of the appeal and attached his brief and its accompanying appendix.

On April 21, 2016, the court issued a "defective document" notice giving counsel until April 25, 2016 to correct various defects.

On April 25, 2016, counsel has done so and again filed.

D.    The Final Judgment Rule

The other interlocutory orders appealed from were not appealable until the case became final by the order of dismissal. The entire appeal is, or will be upon its acceptance, ripe and timely.

2

## II. OTHER STATEMENTS

This brief is submitted in behalf of plaintiff-appellants the Estates of Ernest and Judit Gottdiener, Rabbi Ervin Tausky, and Suan Investments, a family firm.

Primarily, the plaintiff-appellants maintain that the district court erred in failing to remand this case back to New York state court, from which it had been removed by defendant Felix Sater on "federal officer" grounds because, in opposition to their motion to remand, Sater failed to present any competent evidence – no affidavit predicated upon his personal knowledge of the facts, nor any official order, executive or judicial – that he was acting under color of federal law when he violated the laws of the State of New York, and otherwise failed to satisfy the requirements for pleading federal officer removal as set forth by the Supreme Court for a century.

Resolution of this issue in appellants' favor will obviate the need to address the remaining issues, as it will render void all subsequent acts of the district. But, should the court reach them, it should hold that the district court breached its duty to ensure the fairness of the proceedings by failing to investigate Sater's gangster-like threats to harm various plaintiffs if they did not drop their actions against him.

The court should also hold that the district court erred, as a matter of law, indeed exceeded its authority and committed structural Fifth Amendment error in converting the plaintiffs' voluntary dismissal into a with-prejudice dismissal.

A.   Issues Presented, Summary of Facts, Summary of Argument, Standard of Review

    1.   The District Court Failed to Remand

    --   *The gravamen of the appeal*

Plaintiff-appellants, with others, commenced this non-diverse case with only state law claims in state court without a complaint, by filing a Summons with Notice. Among the claims it noticed were common law fraud, that defendant-appellant Felix Sater had unlawfully concealed his federal racketeering conviction from plaintiffs and those whom they represented in the face of a legal duty to disclose it.

Sater removed it to federal court claiming "federal officer" jurisdiction, claiming that as a cooperator he had to keep his cooperation secret and so had to keep his conviction secret, and that he had been ordered to do so.

A hundred fifty years of Supreme Court precedent holds that such removal requires a specifically averred pleading showing both that the acts complained of were within the scope of federal duties and that there was a federal defense, and that the acts taken were the least harmful necessary under the circumstances. An almost equally long history of Second Circuit precedent holds that such a showing must be by competent evidence, including a demonstration that the control placed over him was detailed and specific, not just a general order to go out and defraud.

4

By these standards, Sater's petition, or rather his opposition to remand, was fatally flawed, for he failed to produce one shred of averment pursuant to evidentiary standards, no affidavit, nor attorney affirmation, nor documented order; nor could he even state when he was ordered to do what, or by whom, or in what words.

Nevertheless, the district court refused to remand, denying our motion.

-- *The standard of review is abuse of discretion.*

Failure to remand is ordinarily reviewed for abuse of discretion.

2.   THE DISTRICT COURT FAILED TO INVESTIGATE WITNESS TAMPERING

After the court denied remand, it ordered an initial complaint filed (the case had been brought by Summons with Notice). On the day it was due, Sater, a twice-convicted felon once incarcerated for assault with a deadly weapon, emailed two of the plaintiffs and warned that he would ruin them if they didn't abort the filing, then sent equal warnings throughout the world to hundreds of persons at their employers and their parents' employers. Witness tampering is a felony, and a per se fraud on the institution of the court itself, yet the district court refused to stay proceedings to conduct emergency hearings on the tampering, holding that Fifth Amendment rights to a fair trial, and her obligation to provide one, did not apply at the pleading stage and warning that we would face sanctions if we brought it up again.

-- *The standard of review is constitutional, de novo.*

Failure to preserve and protect a trial free of intimidation is Fifth Amendment structural error, so the standard of review is constitutional, that is, *de novo*.

3.   THE DISTRICT COURT VACATED PLAINTIFFS' VOLUNTARY DISMISSAL AS OF RIGHT AND "CONVERTED" IT TO A DISMISSAL WITH PREJUDICE, WITHOUT AUTHORITY, FINDINGS IN SUPPORT, REASON, OR BASIS

-- *The gravamen of the appeal*

Plaintiffs then filed a complaint, but the magistrate below, to whom had been assigned pre-trial matters, entered an order barring dissemination of information-which appeared to bar serving it. Plaintiffs sought relief from that order from the district judge, and at their request the magistrate entered an order enlarging time to serve the complaint (and summons, as no process had ever issued). No one sought relief from the magistrate's order enlarging time, so it became forever unappealable.

Seven months later, the district court vacated the anti-dissemination order, but the magistrate soon reimposed it, without notice. Plaintiffs again sought relief from the magistrate's order from the district judge, but after months of inaction gave up and filed a voluntary notice of dismissal pursuant to F.R.C.P. § 41(a)(1)(A)(i).

Despite the fact that, like all the other defendants, he had never been served and never waived service (or he would have defaulted by not answering), months

after the voluntary dismissal, defendant-appellant Sater, who without leave to intervene had no standing to do anything, moved to vacate the voluntary dismissal and have it "converted" into a dismissal with prejudice pursuant to FRCP § 41(b).

The district court granted that motion, making this the first case in history where time to serve extended indefinitely, plaintiffs voluntarily dismissed, yet the court claimed the authority to set that aside and order it dismissed with prejudice; all this done without findings, hearings, reason, explanation, or other support.

-- *The standard of review should be constitutional de novo.*

While imposition of a dismissal with prejudice as a sanction would ordinarily be reviewed for abuse of discretion, here, where it was done devoid of process, the court never making a record of how, why, and by what authority it acted, review must be for structural, constitutional (Fifth Amendment) error, *de novo*.

# BACKGROUND

On May 10, 2010 several persons commenced *Kriss I*[3], a civil RICO case in the Southern District, claiming that they had been harmed by the *Kriss I* defendants' operation of, or conspiracy to operate, a business, Bayrock Group LLC, as a criminal enterprise. The claims covered acts taken from 2002 into 2008. *Kriss I* is currently *sub judice*, though with a third amended complaint and new plaintiffs' counsel.

Among those defendants was Felix Sater, a defendant-appellee here. Sater is notorious because of *Kriss I*, as the racketeering scheme it alleged was the operation of Bayrock through a pattern of fraudulently concealing his ownership in the firm and his criminal history, which included a 1998 federal conviction on racketeering charges which had been hidden for years. *Kriss I* alleged, and there is no dispute that, the only reason Sater got away with concealing his conviction was that his federal criminal case had been questionably "sealed" because he had become a cooperator.

On May 10, 2013, the *Kriss I* plaintiffs, joined by four others, commenced this case, *Kriss II*, by filing a Summons with Notice in Supreme Court, New York County[4]. By its terms the Notice made clear that only claims in state common and statutory law were pending, emphasizing that no federal claims were imminent.

---

[3] *Kriss et al. v. Bayrock Group LLC et al.*, 10-CV-3959 (SDNY)(Schofield, J.)

[4] *Kriss et al. v. Bayrock Group LLC et al.*, Supreme Court, New York County, No. 651715/13.

From the standpoint of the original *Kriss I* plaintiffs, *Kriss II* was primarily a temporally supplemental pleading, making claims, again including Sater concealment frauds, arising from events that happened after the 2008 end date of the *Kriss I* complaint. In short, they bifurcated their overall case, as they had every right to do.

From the standpoint of the new plaintiffs, *Kriss II* was a *de novo* pleading that made claims that included Sater's concealment frauds, but in their case for the first time and made claims arising from events occurring before 2008 as well as after.

On June 21, 2013, Sater removed this case to the SDNY, where it was assigned to the same judge to whom had been assigned *Kriss I.*

On August 2, 2013, plaintiff-appellants moved to remand the case.[5]

On February 25, 2014, the district court denied their motion. That was error, and from it, that court lacked jurisdiction to do anything, so all of its subsequent acts were void. Accordingly, we begin with the failure to remand because, if we prevail, this Court need not, and cannot, reach the other arguments presented as it must then order the entirety of the case after the denial of remand to have been void.

Counsel no longer represents the *Kriss I* plaintiffs, and this appeal is brought solely in behalf of the four additional *Kriss II* plaintiffs. Counsel also appeal *pro se* to protect any appealable interests they might have herein.

---

[5] This was a superseding version of the motion to remand, which supplanted an earlier iteration.

# ARGUMENT

## III.    THE FAILURE TO REMAND

### A.    Sater's Removal Asserted "Federal Officer" Jurisdiction

Congress has authorized federal-officer removal since 1815[6]. Such removal is currently authorized by 28 U.S.C. § 1442(a)(1), which, as pertinent here, provides:

> (a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

> (1) [A]ny officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office....

Defendant-appellee Sater removed this case pursuant to this statute. And if one analyzed it by a plain reading of its text, one would conclude that its application to this case is simple, that if Sater had committed the acts which the *Kriss II* plaintiff-appellants were complaining of (1) while a federal officer (or acting under one) and (2) under color of that federal office, in sum and substance the equivalent of a "within the scope of employment" standard, that alone would entitle him to removal. But such analysis would be incomplete, as the jurisdictional issues are not that simple and there are intertwined procedural, or pleading, requirements, as well.

---

[6] *See Willingham v. Morgan*, 395 U.S. 402, 405 (1969) (tracing history of federal-officer removal).

**B.** **SATER'S REMOVAL REQUIRED THAT HE PLEAD BY SPECIFIC AVERMENT THAT THE ACTS CHARGED WERE TAKEN UNDER COLOR OF OFFICE AND THAT THEY WERE SUBJECT TO A COLORABLE FEDERAL DEFENSE**

The last time the Supreme Court spoke of § 1442 in a context similar to this case was in *Mesa v. California*[7], so *Mesa* ought to govern its resolution. In *Mesa*, the Court set forth a removal paradigm, subject of course to refinement by percolation:

In removed state *criminal* proceedings:

a.   The federal officer must have been acting under color of office;

b.   The federal officer must have a federal defense (the Court, though confirming this was an Article III jurisdictional requirement, left open the question whether in a truly unique case presenting a clearly, terrifically hostile state venue that alone might suffice);

c.   There must be a causal connection between what the officer has done under asserted authority and the prosecution;

d.   It must appear that the prosecution has arisen out of the acts done by him under color of federal authority; and

e.   The federal officer must plead by direct and specific averment in his removal petition that the prosecution as based on acts or conduct not justified by his federal duty;

In removed state *civil* proceedings:

f.   It may suffice in certain cases, for example with a "scattergun" complaint, if the removal petition, instead of pleading the federal defense by direct averment, well pleads that the federal officer's relationship to respondent derived solely from his official duties.

---

[7] 489 U.S. 121 (1989) (United States postal workers could not remove state charges of reckless driving while on duty as they did not, and could not, aver that they had a federal defense).

11

*Mesa* was analyzed in *DeVecchio*[8], another notorious case where a cooperator removed (or tried to) a case from state court. In *DeVecchio*, New York had charged a rogue FBI agent with murder, claiming that as the FBI handler for Gregory Scarpa, an FBI informant and mafia boss, DeVecchio had tipped off Scarpa as to the identities of witnesses against him, who had then been killed, allegedly by Scarpa.

In granting New York's motion for remand, Judge Frederic Block noted that while DeVecchio had purported to follow the *Mesa* paradigm, he had fallen far short.

*DeVecchio* is important here for two reasons. First, Judge Block's analysis of *Mesa* is masterful, and admitting our inability to improve it, adopt it in its entirety. And second, for its explanation of DeVecchio's failure to plead a colorable federal defense or lack of need for one, as Sater's explanation failed to do so below.

## C. SATER'S REMOVAL, LIKE DEVECCHIO'S, FAILED TO SATISFY *MESA*

### 1. SATER FAILED TO SHOW THAT HE ACTED UNDER COLOR OF OFFICE

No one can seriously claim that as a convicted felon who was cooperating to buy down his sentence, Sater was a federal officer. At best he could show that, as an informant, he was a person "acting under" an officer, presumably an FBI handler.

---

[8] *New York v. DeVecchio*, 468 F. Supp. 2d 448 (E.D.N.Y 2007).

In this he failed, but because it is easier to see after first analyzing his failure to show that he had a federal defense, we defer it briefly.

2.    SATER FAILED TO WELL AVER THAT HE HAD A FEDERAL DEFENSE

--    *His averment was inadequate by* Mesa*'s criminal standards*

Sater, like DeVecchio, asserted a federal defense of immunity but, also like DeVecchio, failed to do so by specific averment. And, even though this is a civil case where *Mesa* suggested a different averment test may apply, he failed that test, too.

DeVecchio was charged with aiding and abetting Scarpa's murder of mob witnesses. He claimed federal defenses, including immunity. But, the court explained:

> As for his immunity defense, although DeVecchio's general claim that everything he did was in the context of the discharge of his federal duties might…satisfy the broad pleading requirements…for removal in civil cases, he…cannot satisfy the more stringent requirements for criminal cases by denying that he ever said anything to Scarpa about the victims Scarpa allegedly arranged to murder, and hence could not have been an aider and abettor….
>
> [He] does not, of course, claim that he was authorized to disclose information to Scarpa about the four victims that could have lead [sic] to their murders; nor does he detail whatever conversations he did have with Scarpa that could arguably have been misconstrued as aiding and abetting those murders. He is simply being charged with outright murders having nothing to do with his federal duties. As the Supreme Court aptly noted in *Symes,* "while homicide that is excusable or justifiable may be committed by an officer in the proper discharge of his duty, murder or other criminal killings may not."
>
> In short, this is not a case where the federal officer claims that "I did it, but was authorized or justified" -- or even "What the State contends I

13

did, though mistaken or false, I was authorized to do." Although it may well be that DeVecchio's denial of the charges may justifiably be based on the fact that he never spoke to Scarpa about the victims, this is simply not a defense based on federal immunity giving rise to Article III "arising under" jurisdiction. And DeVecchio's claim that his only contact with Scarpa was as his FBI handler amounts to nothing more than a "scope of employment" claim, which, as *Ivory* and *Cisneros* re-inforce, is insufficient to satisfy the pleading requirements for an immunity defense in a criminal case.

Compare this with the font of Supremacy Clause immunity, and leading Supreme Court precedent on the subject, *In re Neagle*[9] , in which California sought to prosecute a U.S. marshal who had been assigned to protect Supreme Court Justice Stephen Field in his annual circuit assignment in California. When an unhappy litigant stormed the justice's dining car, the marshal, mistakenly believing the man armed, shot and killed him. The Court held him immune from state prosecution:

> [I]f the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and if in doing that act he did no more than what was necessary and proper for him to do, he *cannot* be guilty of a crime under the law of the State of California.

To have immunity, a federal officer need only have been discharging duties by acts within his authority which are no more than what was necessary and proper. But to remove he must specifically aver that, not make a general, "scope" averment.

---

[9] 135 U.S. 1 (1890).

The same principle applied in *Maryland v. Soper*[10]. There, federal agents were indicted for murder in state court. Seeking to remove the case, they affirmed that, after destroying a still and pursuing its operators, they had come upon the victim while walking back to the farm where the still was located.[11] Removal was rejected because the averments were "not sufficiently informing and specific," amounting …

> to hardly more than to say that the homicide on account of which they are charged with murder was at a time when they were engaged in performing their official duties. They do not negative the possibility that they were doing other acts than official acts at the time and on this occasion, or make it clear and specific that whatever was done by them leading to the prosecution was done under color of their… duty….

> [The defendants did] not negative the possibility that they were doing other acts than official acts at the time and on this occasion, or make it clear and specific that whatever was done by them leading to the prosecution was done under color of their federal official duty…. [T]he person seeking the benefit of [the removal statute] should be candid, specific and positive in explaining his relation to the transaction growing out of which he has been indicted, and in showing that his relation to it was confined to his acts as an officer.[12]

> There must be causal connection between what the officer has done under asserted official authority and the state prosecution. It must appear that the prosecution of him, for whatever offense, has arisen out of the acts done by him under color of federal authority…and he must by direct averment exclude the possibility that it was based on acts or conduct of his not justified by his federal duty.[13]

---

[10] 270 U.S. 9 (1926).

[11] *See* 270 U.S. at 23-24.

[12] *Id.* at 35.

[13] *Id.* at 33.

15

Now consider Sater's role in the present case. He was charged here with common-law fraud for wrongfully concealing his conviction. The elements of that tort are that (1) the fact of conviction was material; (2) he had a duty to disclose it; (3) he intentionally failed to do so; (4) the plaintiffs reasonably relied on his silence; and (5) they were harmed as a result. Importantly, the concealment alone does not complete the tort; formation of a relationship (partner of the *Kriss I* plaintiffs here, a criminal who stole from the newly entering plaintiff-appellants here) where there is a duty to disclose, followed by a breach of that duty, is also required.

Yet, when Sater averred to a federal defense by claiming immunity, the only averment he made (through counsel, not upon personal knowledge, and not even sworn) was that he had been "ordered" (*infra*) not to disclose his status as a cooperator and disclosing his conviction would have disclosed that status. In other words, that he had been authorized to, perhaps even had a duty to, conceal it.

Suppose a covert member of Seal Team Six had his cover exposed to an enemy combatant while in country *en route* to kill bin Laden. No one doubts that if he killed the man, he did so with immunity. It may even be so if the man was an innocent civilian. But if the Seal was home on leave and exposed the secret to his neighbor at a block party, none would suggest he could kill the man with immunity, because he was not at the party as part of his federal duties.

16

But, that's what plaintiff-appellants accused Sater of. The plaintiffs below who were his partners accused him of defrauding them as partners, and the plaintiffs below who were his victims accused him of defrauding them as victims. It's the equivalent of the (estate of) the dead neighbor suing for wrongful death.

For Sater to remove, the district court should have, but failed to, require him to aver with specificity that he was acting as a cooperator, fulfilling his duties, when he entered into those relationships with the defendants, and continued to be acting as a cooperator fulfilling his duties when he lied, and that all that gave rise to a causal connection between the performance of his federal duties and the fraud.[14]

-- *His averment was inadequate by* Mesa's *civil standards (if any)*

As noted, in *Mesa* the Court suggested, but did not hold, that in the federal officer removal of a civil case, at least where it would be burdensome to aver color of office and a federal defense with specificity, it might be acceptable to aver generally.

In *Willingham v. Morgan*[15], a prisoner of a state correctional facility had sued federal prison officials in state court on state law grounds for injuries the plaintiff allegedly received while imprisoned.

---

[14] If, for example, Sater had averred that, as a cooperator, he had been ordered to infiltrate Bayrock to gather intel on its criminal activity, including that of the persons he would partner with, his concealment could have been colorable and no more than necessary and proper.

[15] 395 U.S. 402 (1969).

The defendants denied knowledge of wrongdoing, relying on the undisputed fact that their only contacts with the plaintiff had occurred inside the penitentiary while they were performing their duties.

Recognizing a tension between that part of *Soper* requiring the person seeking removal be "'candid, specific and positive in explaining his relation to the transaction' which gave rise to the suit," and its qualification that "the federal officer, in order to secure removal, need not admit that he actually committed the charged offenses," the Court in *Willingham* viewed the officials as confronted with a dilemma:

> Respondent had filed a "scattergun" complaint, charging numerous wrongs on numerous different (and unspecified) dates. If petitioners were to be 'candid, specific and positive' in regard to all these allegations, they would have to describe every contact they ever had with petitioner, as well as all contacts by persons under their supervision. This would hardly have been practical, or even possible for senior officials like petitioners.

The Court said that "[i]n a civil suit of this nature…it was sufficient for petitioners to have shown that their relationship to respondent derived solely from their official duties." Recalling its language in *Soper* that "color of office" required showing a "causal connection," it viewed the showing in *Willingham* as sufficient to "put in issue the questions of official justification and immunity" warranting removal.[16]

---

[16] *Id.* at 409.

In *Mesa*, the Court explained that "[i]n *Willingham* we adverted to the causal connection test of *Soper*, not as a substitute for the averment of an official immunity defense, but as a means of delimiting the pleading requirements for establishing a colorable defense of that nature."[17]

Yet even if that "advertence" is given effect as precedent, still this is of no help to Sater, because he would have to have pleaded that his relationship with plaintiffs here "derived solely from his official duties," and he did not.

-- *His averment was inadequate for one acting "under" a federal officer*

While *Mesa* and its corollaries easily apply to those who, though they are not federal officers, are "acting under" them, lower courts, including the courts of this circuit, and this court itself, impose additional requirements on such removals.

A person claiming that he was acting under the orders of a federal officer must aver with specificity what those orders were, that they were lawful, that they were detailed, and that they were directed to the situation at hand, not just "general."

Sater did not do so, nor could he have.[18]

---

[17] *Mesa*, 489 U.S. at 133 (citing *Willingham*, 395 U.S. at 409).

[18] No federal officer could give Sater authority to act with immunity in a way the officer did not have. In the Seal Team Six hypothetical, while an appropriate admiral could even impliedly authorize the member to use deadly force, so allowing him to kill those in country who learned of his status (as in *Neagle*, where authorization to kill the man apparently threatening the judge was held not to have had to have been express), he certainly could not impliedly or explicitly authorize the Seal to use deadly force against his neighbor at the block party.

19

-- *His averment was inadequate because it proffered no evidence*

While *Mesa* and its corollaries easily apply to those who, though they are not federal officers, are "acting under" them, lower courts, including the courts of this circuit, and this court itself, impose additional requirements on such removals.

While Sater's opposition to remand attached all sorts of documents, not one contained any orders directing him to conceal his conviction, or his cooperation. App. A58-A157. For emphasis, though he repeated throughout his memorandum of law that he was under such orders, he gave no evidence of who gave them, or when, or what they said; he never produced any in writing; and, tellingly, the one time he'd have been expected to do so, when he said that a sealing order of Judge Glasser had required this, he didn't even proffer, didn't even state, didn't even describe at all, any of the decretal language or written expression of that purported order.

Moreover, not only did he fail to give his own affidavit, he didn't even bother to submit his attorney's affirmation.

The law is radiantly clear here, that he had to do more than merely argue a point, he had to *show* it, had to at least proffer evidence such that we could refute it and the court conduct a hearing to resolve factual disputes, elemental due process[19].

---

[19] *See, e.g., Cuomo v. Crane Co.*, 771 F.3d 113, 117 (CA2 2014) ("Respecting the policy behind the federal officer removal statute, we emphasize that the district court's role on a remand motion is not to resolve whether the defendant has established the federal contractor defense or to resolve

Needless to say, especially given our respectful insistence the he be ordered to give such evidence, even merely an affidavit that he actually had at all times obeyed the orders he claimed to be under, the court's failure to require this was error.

And finally, we ourselves introduced below his actual cooperation agreement, which clearly states, contrary to what he said in his (unsworn) papers in opposition to remand, that he is not to reveal his cooperation "except after consulting the government" when it might be necessary, and he never set forth that he asked for permission to tell the truth about his conviction and was denied.

-- *His averment was inadequate and incurably so for legal impossibility*

In *Reiser v. Fitzmaurice*[20], on which Sater relied heavily below, the court noted that *colorable* doesn't mean that any slop put before a judge will suffice to establish the defense. Sater misrepresented *Reiser* and other cases on point. As *Nesbiet v. GE*[21], following *Reiser*, explained:

> The first requirement for federal officer removal – a colorable ***federal*** defense – is broadly construed. But, citing *State of Colorado v. Symes*,

---

factual disputes, ***but only to ensure the existence of some competent evidence*** supporting a 'colorable' federal defense." (Emph. Add.); *Hilbert v. McDonnell Douglas Corp.*, 529 F. Supp. 187 (D. Mass. 2008) (conclusory affidavit submitted in opposition to motion to remand insufficient to defeat motion to remand a case that had been removed to federal court pursuant to the federal officer removal statute); *Westmiller v. IMO Indus.*, 2005 U.S. Dist. Lexis 29731, *9 (WD Wash. 2005) (expert affidavit that was vague as to the specifications that the defendant was allegedly required to follow was insufficient to establish the propriety of federal officer removal).

[20] 1996 WL 54326 (SDNY 1996).

[21] 399 F. Supp. 2d 205 (SDNY 2005).

286 U.S. 519 (1932), the court added, "When a defendant seeks removal pursuant to the federal officer removal statute…it must fairly appear from the showing made that *the defendant's removal claim is not without foundation and is made in good faith.*" [Emph. Add.]

While *factual* underpinnings may be interpreted broadly, where *as a matter of law* there is no immunity or other *federal* defense, there *is* nothing colorable. Despite what Sater would say, federal officer removal routinely fails where *as a matter of law* there is no *federal* defense. Two examples are the motor vehicle accident cases *State of North Carolina v. Ivory*[22] and *State of North Carolina v. Cisneros*[23].

And here, Sater's averment fails as a matter of law because he has no federal defense because this court's prior case law has said so, in a case precisely on all fours, when it held that a cooperator is not permitted to use the concealment of his conviction to defraud in the way we alleged Sater did.

In *United States v. Gushlak*[24], the defendant, who had been cooperating, had had his docket sealed, as a result of which he was able to keep from investors and other members of the public that he had pled guilty to RICO fraud. As a result, at sentencing the government terminated his cooperation agreement and then asked the court to "throw the book at him" by denying him acceptance-of-responsibility

---

[22] 906 F.2d 999 (CA4 1990).

[23] 947 F.2d 1135 (4th Cir. 1991).

[24] 495 Fed. Appx. 132, 2012 U.S. App. LEXIS 18691 (2d Cir. 2012).

credit, arguing that his actions in defrauding his partners and investors by hiding his conviction showed lack of remorse and suggested that he was more interested in using the secrecy of his case to defraud than to help the government.

In upholding the court's agreement and imposition of a six-year confinement and $25,000,000 fine (plus $17,000,000 in restitution), this very court noted: "[W]hile sentencing was pending, Gushlak misrepresented to the public that he had never engaged in any criminal conduct. Gushlak contends that denial of acceptance of responsibility on these grounds was legally and factually erroneous. We disagree."

That is, this court has held that being a cooperator is not a license to lie.

## IV.   THE FAILURE TO INVESTIGATE SATER'S WITNESS TAMPERING

### A.   A HYPOTHETICAL

Imagine that while an appeal is *sub judice* before this court counsel for the appellant receives an urgent message from his client informing him that he has just received a letter, *sent directly to him*, from the attorney representing the appellee warning him that if he does not withdraw this appeal the appellee will sue him.

What would be this Court's reaction?

Now further assume that the appellee's lawyer has even admitted in that letter that he knows the client he threatened is represented by present counsel, and so has admitted violating the "no contact" rule, to say nothing of possible tampering?

What would be this Court's reaction?

Finally, suppose that lawyer is licensed to practice here.

What would be this Court's reaction? Would it wait to see if the appellant succumbed and moved to withdraw so it didn't have to do anything? Or would it act *sua sponte* to hale the offending attorney before it to show cause why he should not be sanctioned and referred for discipline? May we presume that the one thing it would *not* do would be to threaten to sanction counsel for *appellant* with sanctions for daring to report it, especially considering his ethical obligation to do so?

24

**B.     THAT'S <u>NOT</u> REALLY HYPOTHETICAL. IT, AND FAR WORSE, HAPPENED.**

On April 30, 2015, in the pendency of *Gottdiener v. Sater,* 14-1313, counsel, who represented appellants there, the same persons as are appellants here, received such a letter from another attorney representing Rabbi Ervin Tausky, one of the plaintiffs, telling him that the Rabbi had just received such a letter from a lawyer for Sater, who was a defendant-appellee in that case, as he is a defendant-appellee here.

The letter, dated April 28, 2015, and certified translation, are at ECF 108. It is impossible to mistake its intent, and the author, licensed to practice before this court with offices here and in Israel, knew the Rabbi was represented, as he admitted.

Is there any outrage (we reported it to the court below in this case, because it interfered with the representation of the Rabbi below in this case, as well)?

There is one reason that counsel and Sater would be so brazen: A year before, Sater had threatened the other plaintiffs in this case below, physically and economically, warning he would destroy them if they did not withdraw this case as well.

The district court's response to counsel's report of that tampering and obstruction and request for an emergency stay of proceedings pending a hearing and criminal referral was to refuse, ruling that the Fifth Amendment right to a fair trial and the judicial obligation to provide one did not exist at the pleading stage, and to threaten counsel with sanctions if he brought it up again.

25

## C.  THE CHRONOLOGY OF THE AFFRONT, WHICH OCCURRED SHORTLY AFTER THE DISTRICT COURT DENIED REMAND

On February 25, 2014, this court denied plaintiffs' motion for remand and directed that a complaint be filed by March 25, 2014 (the case had been removed from state court, where it had been commenced by summons with notice, so there had never been a complaint filed, nor service made, the court below taking the case as it was in state court, after denying remand no parties other than the plaintiffs).

On March 25, 2014, the court enlarged time to April 7, 2014.

On April 7, 2014, defendant-appellant Sater threatened to destroy plaintiff Ejekam if he didn't order counsel not to file a complaint, pointedly noting that he had engaged in economic and physical terrorism of Kriss and his family to force him to drop the case, and would do so for the rest of Kriss's life, and unless Ejekam wanted to join him and be subject to perpetual terror, he would order the complaint not filed or withdraw.

Thereafter, the district court determined to do nothing about this other than to warn counsel that she had no obligation to ensure a fair trial at the early, or pleading stages, and unless he found authority that said otherwise he risked sanction if he brought the issue up again.

26

### D. THE COURT'S REFUSAL TO INVESTIGATE ALLEGATIONS OF SATER'S WITNESS TAMPERING AND OBSTRUCTION, RULING THAT THE FIFTH AMENDMENT RIGHT TO A FAIR TRIAL, AND THE COURT'S DUTY TO ENSURE ONE, SOMEHOW DID NOT EXIST AT THE PLEADING STAGES

On the morning of April 7, 2014, Nigerian time, Ejekam, an original *Kriss I*

plaintiff in this case below then living in Lagos, woke to find that over the weekend

he had received the following email:

> From: Jody Info [mailto:jkrissinfo@gmail.com]
> Sent:   05 April 2014 17:02
> To:     Michael Chu'di Ejekam
> Subject:      Fwd: Jody Kriss
> Dear Michael Chu'Di Ejekam,

By Monday, Fred has to finalize this absurd extortion of a lawsuit against the largest people, companies and law firms in real estate. If on monday your name remains part of this extortion, you will only have yourself to blame.

See your friend and co-plaintiffs' new lifetime online reality. If you choose to continue with this extortion, It will also be your new online reality for the rest of your life, you can explain to people why these companies owe you $1 BILLION DOLLARS. This is your one and only warning.

It contained two attachments, one the initial coversheet of this action, ECF

53, Exh. 6 thereto, the other a list of websites they took credit for having caused or

sued to republish Kriss libels[25], Exh. 4 thereto.

---

[25] On March 13, 2014, a blog, *queens-politics.com*, ran a story that plaintiff Kriss was negotiating for a development project and was a front for organized crime, might employ the Russian mob on the project, had admitted committing extortion, and had given protected documents to mobsters which for all anyone knew had caused assaults and death threats as a result.

On March 16, 2014, counsels for defendants Sater and Lauria below filed a state court action in behalf of Lauria against Kriss, *Lauria v. Kriss* (N.Y. Sup. Ct. 152324/14), accusing him and his

But it wasn't sent to Ejekam alone. It was simultaneously sent to employees and officers throughout the worldwide offices of the private equity investment fund where he worked, by unauthorized use of its internal email system, Sater having obtaining the internal ID necessary to cause the system to rebroadcast it. That caused severe professional problems for him, and, knowing that other Bayrock employees had testified under oath that Sater had threatened to kill them if they told what they knew of his criminal conduct at Bayrock, he felt threatened at the least with having his reputation smeared and livelihood destroyed if he continued. Accordingly, in fear for his safety, the safety of his family, and the safety of Kriss, counsel, and their families, he asked counsel to obtain a stay to take time to consider what to do.

---

father, a partner at Stroock, of running Bayrock to launder proceeds of Russian organized crime and conspiring with attorney Gerry Shargel of Winston & Strawn, giving him protected document to pass on to organized crime to have Sater and Lauria murdered by mafioso Daniel Persico in furtherance of their extortion of law firms, a plot it said resulted in assault and death threats.

*PRNewswire* globally republished the Lauria complaint and related press releases while persons purporting to be private detectives, one identifying herself as hired by Sater's lawyers, swarmed through New York accosting Kriss's employees, partners, customers, and investors, claiming to be public officials and telling each that Kriss was under investigation and they could be next.

Meanwhile, websites in permutations of Kriss's name, for example *jodykrissthief.com*. repeated the libels. Exh. 3. ICANN revealed that Sater owned it (he has since scrubbed the listing).

Anonymous ads appeared, for example in *Real Estate Weekly*, for which the copy was delivered by messenger in an unmarked, untraceable envelope with bundles of cash, followed by anonymous mailings and emailings of those ads plus press releases and lists of websites republishing the libels.

One such mailing occurred on the morning of April 7, 2014, a bulk email that was sent to each of the 375 attorneys at Stroock, Kriss's father's firm, with the same material.

That same day, April 7, 2014, counsel counsels notified the court of the tampering, requesting an emergency stay pending hearings and criminal referral.

On April 8, 2014, the court granted stay and directed defendants to respond.

On April 14, 2014, defendants replied, but did not respond, pointedly failing to admit or deny any of plaintiffs' allegations of witness tampering.

On April 17, 2014, the court vacated the stay, declined a conference, hearings, and a criminal referral, and directed a complaint be filed by April 23, 2014.

On May 1, 2014, plaintiffs requested reconsideration of that denial.

On May 8, 2014 (ECF 62), the Court denied reconsideration, holding there was no First Amendment right to a fair trial at the pleading stage and unless counsel found such authority, if he brought the issue up with again he risked sanction.

## E.  COMPARE THIS WITH JUDGE POSNER'S RESPONSE TO TAMPERING

When miscreants and their counsels threaten clients with harm if they don't drop a suit, whatever is left of justice and due process demands the court's wheels come to a screeching halt in an instant and the court take action to shut it down.

We include the following from Judge Posner's opinion in *Ty Inc. v. Soft-belly's, Inc.*[26] , which speaks for itself:

---

[26] 353 F.3d 528 (7th Cir. 2003).

The judge committed a different kind of error in excluding another item of Softbelly's evidence. One of Softbelly's…witnesses was to be Harold Nizamian, a competitor for whom Ty Warner had worked before forming his own business.

Nizamian was prepared to testify that as early as 1988, before Ty began selling "Beanie Babies," the word "beanie" was being used in the trade names of other manufacturers of "plush beanbag animals" and indeed that the word had become generic.

On the Friday before the Monday on which the trial began, Softbelly's lawyer deposed Warner and in the course of the deposition disclosed that Nizamian would be testifying that "beanies" was a generic term.

On Monday, when the lawyer called Nizamian to schedule his testimony, Nizamian said that he had been telephoned by Warner and was no longer willing to testify. Putting two and two together, at the trial Softbelly's lawyer asked Warner whether he had told Nizamian not to testify. Ty objected and the judge sustained….

We do not understand the judge's ruling. If Warner asked Nizamian not to testify, this would entitle the jury to infer that Nizamian's testimony would have supported Softbelly's contention that "beanies" had become a generic term. "[A]n attempt by a litigant to persuade a witness not to testify is properly admissible against him as an indication of his own belief that his claim is weak or unfounded or false."…

Warner admits that he telephoned Nizamian in order to inquire whether he was going to testify, and after the trial was over Softbelly's lawyer deposed Nizamian who in his deposition stated that Warner had told him that if he testified it would cost Warner "a tremendous amount of money" and cause "a lot of problems"; that he (Warner) "was involved in the Softbelly's case and that if my statement got into the case … it would be very damaging to him." Nizamian added that his situation with respect to Ty was "delicate" because he and Warner had recently discussed the possibility of doing business together and "I realized after speaking to Ty that it was a very important matter to him, and even though I didn't understand all of the particulars, I felt if he felt that strongly about it … maybe it would be best if I did not go." Nizamian did not say that Warner had threatened him, but "because of the seriousness in his voice and the importance to him, … I figured

30

I'd just rather not get involved." Nizamian's deposition became the basis of Softbelly's Rule 60(b)(3) motion, and we shall get to that in a moment; our present point is only that the judge should not have cut off the lawyer's cross-examination of Warner concerning his phone conversation with Nizamian....

We move now to the Rule 60(b)(3) issue. The rule authorizes the...court to set aside a judgment on the basis of fraud or other misconduct.... We need not...decide whether the conduct alleged as fraud — that Ty Warner had tampered with a prospective witness for Softbelly's... — is better described as "other misconduct" because it did not involve deceit. Misconduct triggers the rule too. ***Witness tampering is often described as a form of fraud, and it is certainly very serious—indeed, criminal....***

The district judge's response to the motion was perfunctory. Without conducting a hearing to determine what exactly Warner had told Nizamian, the judge denied relief on the ground that Nizamian had said in his statement "that the reason he would not testify was due to his own time constraints. The witness also stated that he told Ty Warner that he would testify and that Mr. Warner had made no threats or attempted to dissuade the witness from testifying." It is true that Nizamian gave time constraints as one reason for not testifying, but as is apparent from the passages that we quoted earlier from his deposition, that was not the only reason. Indeed, the deposition suggests that it was not the decisive reason. For it was in answer to the question what the "specific reason" for his changing his mind about testifying was that he said that he had "realized after speaking to Ty that it was a very important matter to him ... [and] if he felt that strongly about it, ... maybe it would be best if I did not go." Nizamian was not threatened, but there is very little doubt — if his deposition is believed, and the judge gave no reason to disbelieve it — that Warner attempted to dissuade him from testifying.

***Witness tampering is extremely serious misconduct***, as we have said, and it would be particularly egregious if committed by a person of Warner's wealth and standing in the business community. We do not say that he did tamper with Nizamian, that if he did it was the cause of Nizamian's not testifying, or that dismissal of the suit would be the

only appropriate sanction…as the Supreme Court emphasized…federal fraud laws do not require proof by clear and convincing evidence, but only by a preponderance of the evidence.

*[W]e hold…that Nizamian's deposition, in conjunction with Warner's admission to having called Nizamian on the eve of trial to discuss the case, required further investigation by the judge. Had the judge concluded that Nizamian's version of the phone conversation was accurate, there would have been compelling evidence of serious misconduct on Warner's part, requiring a commensurately severe sanction, quite possibly dismissal of Ty's suit….*

*The judgment for Ty and the order denying Softbelly's Rule 60(b)(3) motion are reversed and the case is remanded for further proceedings consistent with this opinion. Circuit Rule 36 [reassignment to a new judge] shall apply on remand. [Emph. Add., citations omitted].*

# V.   THE *ULTRA VIRES* VACATUR OF VOLUNTARY DISMISSAL AND FOLLOWING DISMISSAL WITH PREJUDICE

## A.   THE HISTORY AFTER THE REFUSAL TO INVESTIGATE THE TAMPERING

Respectfully, we remind this court that plaintiffs came to the district court only because their state court case had been removed from state court. Moreover, it had been removed before a complaint had been filed or anyone served.

### 1.   THE FOLLOWING CHRONOLOGY IS EXTRACTED FROM THE DOCKET:

On April 17, 2014, in its order refusing plaintiffs' motion to investigate the tampering, the district court ordered plaintiffs to file a complaint by April 23, 2014.

On April 23, 2014, plaintiffs filed a complaint, which again was the initial complaint in the matter. Accordingly, plaintiffs thereafter would at some time have a right to amend at least once. FRCP § 15.

On May 1, 2014, as part of their motion for reconsideration of the district court's refusal to investigate the tampering, plaintiffs explained to the court that the complaint they had filed had been severely limited by the threats made against them by Sater, and argued that fundamental fairness entitled them to file a new one without it counting as the "free" one of right.

On May 5, 2014, by its order denying reconsideration of its earlier refusal to investigate the tampering, the district court granted leave for plaintiffs to file such a "superseding complaint" provided they did so by May 22, 2014.

On May 21, 2014 plaintiffs, concerned that the court might feel much of it might have to be sealed as it contained information overlapping with the complaint under seal in *Kriss I*, initiated the process of filing that superseding complaint under seal by time-stamping it at the dropbox and then, the next day, submitting a request for a scheduling order for sealing hearings along with a proposed order. The order was never signed and so plaintiffs were never able to complete the filing process.

On May 29, 2014, the magistrate below assigned to general non-dispositive pre-trial matters ordered that the initial April 23, 2014 complaint be sealed.

Also on May 29, 2014, on the docket of *Kriss I*, the magistrate issued an order which, *inter alia*, while making no findings at all to support it, prohibited dissemination of certain information which had been used in that case – information which was also contained in both the initial and substitute complaints in this case.

Emphasizing: As of May 29, 2014 (1) the initial complaint had been filed and sealed and a superseding complaint stamped in but not deposited with the clerk as

plaintiffs were awaiting scheduling orders for sealing proceedings; (2) no defendants had been served[27]; and (3) *plaintiffs had just been ordered not to disseminate information in both complaints so could serve neither without leave of court*.

On June 12, 2014, plaintiffs filed an FRCP § 72 request to set aside the order of the magistrate which barred them from disseminating that information, requesting emergency expedited resolution because of the First Amendment implications.

As of August 15, 2014 the district court had not yet ruled on that request to set aside, so counsel moved the magistrate to enlarge time to serve the summons and complaint *sine die*.

On August 20, 2014, over the objection of counsel for Sater, the magistrate so ordered, granting plaintiffs a *sine die* enlargement to serve.

On March 23, 2015, fully nine months after it was filed, the district court finally ruled on that motion to set aside, ordering that the bar on dissemination would vacate a week later on March 20, 2015 if no one moved for an injunction.

On March 27, 2015, the magistrate countermanded the district court's order by ordering that no one could file any papers before an April 14, 2015 conference.

---

[27] Assuming the 120-day rule of FRCP § 4 applied, and started with the April 23, 2014 filing of the initial complaint, it would extend through August 21, 2014.

On April 14, 2015, without notice, the magistrate reimposed substantially the same order, preventing dissemination, again expressly admitting that he was doing so without having made any findings of wrongdoing or any reason to support it.

On April 30, 2015, as noted *supra*, plaintiff Rabbi Tausky received a threat from one of Sater's attorneys warning him to discontinue his cases against Sater.

On May 1, 2015, plaintiffs moved for emergency relief from the magistrate's order, and obtained partial relief, but not from the ban on dissemination.

On May 2, 2015, responding to the magistrate's order that the intentions of the remaining plaintiffs, including the Rabbi, be set forth, counsel informed the magistrate of the threat against the Rabbi and explained that the Rabbi and his family (all the plaintiffs represented by counsel) were not yet sure how to handle it.

On May 15, 2015, plaintiffs moved to set aside the magistrate's order.

On July 13, 2015 counsels still barred without cause from dissemination (if the magistrate's order was lawful in the first place, not addressed here); plaintiffs still effectively unable to serve because of that bar; and plaintiffs still with a *sine die* enlargement of time to serve, plaintiffs *as of right* filed an FRCP § 41(a)(1)(A)(i) notice with the judgment clerk, dismissing the case without prejudice.

On October 9, 2015, months later, defendant Sater filed a motion to vacate the voluntary dismissal and replace it with an involuntary dismissal with prejudice.

On November 10, 2015, plaintiff-appellants opposed that motion.

On November 16, 2015, the district court granted the motion with respect to plaintiff-appellants, including the Rabbi, dismissing them, but not the other initial *Kriss I* plaintiffs, with prejudice.

## B.   THE COURT'S ACTION WAS WITHOUT PRECEDENT OR AUTHORITY

### 1.   IN OVERVIEW

Every order of the court in this case was complied with. The only exception we are aware of was a few minutes' tardiness when counsel filed a document due on May 1, 2015 shortly after midnight on May 2, 2015 because it had taken much time to obtain official translations of overseas court orders incorporated in it.

Every deadline in this case, noting the above, was complied with.

Court orders effectively prevented service of a summons and complaint and moreover in recognition of that, the court granted an enlargement of time *sine die* which was still in effect at the time of voluntary dismissal on July 13, 2015.

No notice of pending sanction for anything was ever given.

No findings of fact were made in the order vacating the voluntary dismissal and replacing it with a dismissal with prejudice. No reasoned opinion explained it.

No one having been served with anything, there was no one in the case except for plaintiffs and so no one with the standing even to file that motion to set aside the voluntary dismissal and convert it to a dismissal with prejudice.

2.    THE COURT WAS WITHOUT AUTHORITY TO VACATE THE DISMISSAL BECAUSE THE RIGHT TO DISMISS WAS PLENARY AND INVIOLATE

Case law is absolutely uniform that where, as here, there has been no activity in the case whatsoever other than filing a complaint – no service, no joinder of issue – and no misconduct and no untoward delay, plaintiffs' right to dismiss without prejudice is absolute[28]. Neither movants below, nor the court, ever cited any authority to the contrary, nor could they, as there is none.

3.    EVEN IF A SPECIAL CIRCUMSTANCES EXCEPTION EXISTED AT ALL, NOTHING IN THIS CASE JUSTIFIED ITS APPLICATION

Movants below claimed that special circumstances existed whereby the voluntary dismissal could be vacated, but were unable to decide whether it was in FRCP § 60 for some fraud or misconduct or in some way was because the case advanced "far enough" even though, again, FRCP § 41 makes clear that if there has been no service the right to dismiss without prejudice is absolute.

---

[28] FRCP § 41(a)(1)(A)(i) controls, which provides that a voluntary dismissal is a matter of right where, as here, there has been no answer (and *a fortiori* where, as here, there has been no service, issue, answer or anything else and no one but plaintiffs had standing to seek Article III relief).

For example, movants claimed *Harvey Aluminum*[29] applied. *Harvey* is a 60-year-old case long discredited by every circuit to consider it, *including this one*[30].

And while in *Thorp* there had been extensive pre-answer motion practice and voluminous evidentiary record and days of testimony, here there was nothing whatsoever on the merits – and there could not have been, as plaintiffs were given *de facto* infinite time to serve by order of the court, and, as of right, never did.

As to fraud or misconduct, there has been none in this case. And, sanctions caused by the misconduct of counsel cannot be applied against clients without detailed allegations of the clients' participations in that wrongdoing. There are none here as to the affected plaintiffs, for example the Rabbi, nor can there be.

---

[29] *Harvey Aluminum v. American Cyanamid Co.*, 203 F.2d 105 (CA2 1953).

[30] *See Universidad Central Del Caribe v. Liaison Committee*, 760 F.2d 14 (CA1 1986):

> "[*Harvey*] has not been well received. It has been virtually confined to its facts in the Second Circuit. See *Thorp v. Scarne*, 599 F.2d 1169, 1175-76 (2d Cir.1979); *Littman v. Bache & Co.*, 252 F.2d 479, 481 (2d Cir.1958); *Sheldon v. Amperex Electronic Corp.*, 52 F.R.D. 1, 8-9 (E.D.N.Y.1971). We have been able to locate only one recent case in that circuit that found the rule of *Harvey Aluminum* to be applicable to the facts at hand. In *Grass v. Citibank, N.A.*, 90 F.R.D. 79 (S.D.N.Y. 1981), the court vacated a notice of voluntary dismissal where, as in *Harvey Aluminum*, there had been a preliminary injunction hearing for several days that considered the merits of the plaintiffs' claims and generated a record of 112 pages of testimony. Many other cases in the Second Circuit have refused to invoke the rule of *Harvey Aluminum* on the facts of the case, including cases in which extensive pretrial proceedings had taken place."

4. <u>Even if the Court Could Have Vacated the Dismissal, It Could Not Then Have Ordered a Dismissal With Prejudice</u>

The only basis for ordering such a dismissal (with prejudice) after a putative reopening would be as a near- or quasi- criminal sanction for wrongful delay or similar misconduct. Without repeating the prior arguments, this must be impossible where, as here, the only delay was in serving a summons and complaint and that delay, if delay is even the right word for it, was authorized by order of the court, and also was caused by the plaintiffs' uncertainty how to proceed in the face of Sater's threats and the court's refusal to investigate them.

5. <u>Besides Lacking Standing to Seek Article III Relief, Movants Were Estopped to Seek It</u>

As noted (exhaustively), on August 20 2014, on the request of plaintiffs, the magistrate ordered that their time to serve the summons and complaint would be extended *sine die*. This was a proper order within the scope of his jurisdiction as it was non-dispositive and pre-trial. Accordingly, *FRCP § 59 controlled, and provided that any party who did not timely object within 14 days to a non-dispositive order of a magistrate waived review.*

As the court is aware, cases are legion that FRCP § 60(b) is not a substitute for an appeal. It should follow that FRCP § 60(b) is not a substitute for an objection.

If movants thought the magistrate was abusing his discretion in granting the *sine die* extension, they had a remedy: timely objection. By failing to exercise it they cannot now be heard trying to use FRCP § 60(b) as a way around it.

Similarly, they had an entire year, from the August 20, 2014 entry of that enlargement of time to serve to the July 13, 2015 entry of voluntary dismissal, July in which to move the magistrate for a vacatur or modification or something. They did not. Call it waiver, laches, or whatever, their time was up long ago.

6.   FURTHER REASON MOVANTS LACKED STANDING TO SEEK THE RELIEF

As the record reflects, when plaintiff-appellants here dismissed the case below, they first dismissed as to all defendants *other* than Sater, and *then* dismissed as to Sater. Besides lack of standing for never having been served or waived service, he cannot have standing to do anything that would affect prior defendants where, as here, he was, at the time he was voluntarily dismissed, the only defendant in the case, and only nominally in the case at that.

7.   MOVANT WAS BARRED BY THE DOCTRINE OF UNCLEAN HANDS

Given the contents of the record as set forth herein, the tampering, the threats, the violation of direct contact rules to threaten Plaintiff Tausky, a nonagerian devout Rabbi and Holocaust survivor living in Tel Aviv whose only involvement in

41

all this was as a victim of Sater's racketeering 20 years ago, if unclean hands ever applied, it applies here.

The court may take notice that, sure enough, as we do not yield to criminals or their threats, and did not withdraw, Sater *did* bring suit in Israel, accusing the Rabbi of masterminding an attempt to kill him.

He was thrown out of the Israeli courts and ordered to pay the Rabbi's fees.

Finally, the court may take notice that Sater filed publicly in Israel a document under seal on the docket of *Kriss I*, then admitted to the courts there that he actually had had no reason to file it in the first place, and as a result was assessed costs.

Whether and to what extent this is an act of criminal contempt is beyond the scope of this document. However, it illustrates the point: Sater has no place in any court of equity, nor can all the water in Pilate's basin nor all the scrubbing of Lady Macbeth remove that damned spot; his hands will ne'er be clean.

The same may be said of his counsel, Mr. Wolf, who, when asked on October 6, 2015, by Magistrate Maas whether he would try to deny that Sater was behind all the attacks on Kriss and Ejekam, replied that "it didn't matter" because – seriously – as Mr. Wolf put it, Kriss should consider himself lucky that those attacks were all that happened to him because he deserved far more. See Transcript of October 6, 2015, pages 1 through 5 generally, on the docket of *Kriss I*.

42

## CONCLUSION

Wherefore, it is respectfully submitted that this case must be returned to the district court with an order to remand it back to the New York State Supreme Court, because defendant Sater failed to make a competent showing that, when he engaged in his fraudulent acts at Bayrock Group LLC, he was doing so under color of federal law. In the event the court needs to reach the remaining issues, it must find that the district court abdicated her responsibility in failing to ensure a fair trial, and acted *ultra vires*, and in any event without cause and in abuse of discretion, in converting the voluntary dismissal into a with-prejudice dismissal.

# CERTIFICATE OF COMPLIANCE

The undersigned counsels certify that as determined by MS-WORD 2016 this document contains less than 11,000 words pursuant to the counting rules.

Counsels certify as well that it is entirely in 14-point Arno Pro proportional typeface, double spaced, except for block quotes which are single spaced and foot-notes which are 12-point single spaced.

\* \* \* \* \*

Dated:    New York, New York
            April 20, 2016

Dated:    New York, New York (as corrected by Order of the Court)
            April 25, 2016

/s/ Frederick M. Oberlander, Esq.
The Law Office of Frederick M. Ober-
lander, P.C.
28 Sycamore Lane (Box 1870)
Montauk, New York 11954
(212) 826-0357
fred55@aol.com

/s/ Richard E. Lerner, Esq.
The Law Office of Richard E.
   Lerner, P.C.
122 West 27th Street, 10th Floor
New York, New York 10001
(917) 584-4864
richardlerner@msn.com

44